Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiff

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| R.S., individually and on behalf of A.S., a minor,<br><br>Plaintiff,<br><br>vs.<br><br>QUARTZ HEALTH BENEFIT PLANS CORPORATION<br><br>Defendant. | COMPLAINT<br><br><br>Case No. 2:22-cv-00380 - JNP |

Plaintiff R.S., through his undersigned counsel, complains and alleges against Defendant Quartz Health Benefit Plans Corporation ("Quartz") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. R.S. and A.S. are natural persons residing in Dane County, Wisconsin. R.S. is A.S.'s father.

2. Quartz is an insurance company headquartered in Sauk County, Wisconsin and was the insurer and claims administrator, as well as the fiduciary, under ERISA for the plan during the treatment at issue in this case.

1

3. The plan is a fully-insured employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). R.S. was a participant in the Plan and A.S. was a beneficiary of the plan at all relevant times. R.S. and A.S. continue to be participants and beneficiaries of the plan.

4. A.S. received medical care and treatment at Triumph Youth Services ("Triumph") from September 17, 2020, to November 24, 2021. Triumph is a licensed treatment facility located in Box Elder County, Utah, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

5. Quartz denied claims for payment of A.S.'s medical expenses in connection with his treatment at Triumph.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Quartz does business in Utah and because treatment was provided at Triumph, a Utah facility. In addition, venue in Utah will save the Plaintiff significant costs in litigating the case. Finally, given the sensitive nature of the medical treatment at issue, it is the Plaintiff's desire that the case be resolved in the State of Utah where it is more likely both his and A.S.'s privacy will be preserved.

8. The remedies the Plaintiff seeks under the terms of ERISA and under the plan are for the benefits due under the terms of the plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendant's violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"),

an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### A.S.'s Developmental History and Medical Background

9. A.S. was born in Ethiopia and adopted by R.S. and his wife, ("S.S."), seven months after he was born.

10. It was reported that while A.S. was in utero, A.S.'s biological mother was abused physically and kicked in the stomach several times while she was pregnant.

11. As a child A.S. was extremely charming, gregarious, and could fit in with any group of kids.

12. R.S. and S.S. noticed that A.S. experienced semi-severe mood swings but didn't think too much of it as he was a young boy.

13. When A.S. started public school in kindergarten he had a very hard time with all academic subjects, especially reading.

14. R.S. and S.S. began to notice that A.S. gravitated toward other children who were struggling with their own behavioral disorders. On the first day of kindergarten R.S. and S.S. received a phone call that A.S. was playing with a young boy who was "having fun" trying to strangle A.S.

15. After a disastrous year of kindergarten, A.S.'s parents moved him to Madison Country Day School ("MCDS") where he spent grades one through seven.

16. MCDS provided some extra resources for A.S. so that he had the support he needed to graduate each grade.

17. A.S. was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") in fifth grade.

18. A.S.'s sleep patterns became more erratic and getting up for school was a daily fight. Instead of a normal grumpy kid, A.S. would swear, make threats, and started to physically pushback.

19. Almost anytime that A.S. was confronted with having to do a task, such as his homework, he would blow up verbally and call his parents racial slurs and then disappear in his room for hours at a time.

20. Summers between school were often pleasant for A.S. He could participate in sports and did not have to wake up early.

21. During the Sixth grade A.S. began exhibiting extreme behaviors such as lying about his schoolwork, being disrespectful to anyone with authority, engaging with pornography, and receiving extremely poor grades.

22. Because of A.S.'s behaviors in sixth grade, his parents brought him to see a therapist. A.S. saw this therapist every 2 weeks for a few months but that treatment was ineffective.

23. A.S. stopped engaging with the therapist and became resistant to treatment and hostile to his parents and his therapist.

24. Seventh grade went just as poorly as sixth grade. A.S. made some progress with his grades and participated in more sports, but he was becoming increasingly oppositional.

25. A.S. moved schools in eighth grade after being expelled from MCDS for whipping another student with a belt during school.

26. It was also found out that A.S. had been faking taking his ADHD medication during the last few school years.

27. A.S. was moved to a public school that had a majority African American student body and an African American male principal. This was intended to be very helpful for A.S. so that he could have good role models.

28. S.S. and R.S. also found the only male African American therapist in the county and got A.S. to speak with him. These changes only benefited A.S. for a short time.

29. A.S. found friends who were a bad influence on him, and he became heavily involved with using drugs, dealing drugs, gang activity, stealing, cutting class, fighting with classmates, and many other very concerning behaviors.

30. A.S. had a grade point average of 0.59 his first quarter and a 0.85 his second quarter. Despite the best efforts of his teachers, he was failing in school.

31. During this time, A.S. had become extremely hostile to R.S. He would take out any anger he had by yelling, threatening to kill R.S., physical posturing, destroying property or hitting R.S.

32. R.S. and S.S. found text messages from A.S. about having plans to kill himself. R.S. and S.S. alerted A.S.'s therapist. While these behaviors were concerning, his therapist did not yet recommend that A.S. be taken to the hospital.

33. On numerous occasions R.S. and S.S. found money in A.S.'s room that he could not account for, as well as drugs and drug paraphernalia.

34. Most weekends, A.S. would have some run in with the police and it is suspected that A.S. was getting involved with gang-related activity which included involvement in selling drugs, shoplifting and possible assault and robbery.

35. During the COVID-19 pandemic, A.S. had to attend school from home. This was helpful for him in some ways because he did not have anywhere to partake in his normal activities.

36. This period created an extreme amount of strain between A.S. and R.S. and after being confronted for potentially stealing over a thousand dollars, A.S. became extremely physically violent with R.S. and threatened to have his friends kill R.S. and also destroyed parts of R.S.'s car.

37. In light of the escalation in problems with A.S.'s behavior, it was the recommendation of A.S. treating clinicians that he receive more intensive care in a specialized and monitored inpatient residential treatment setting.

**Triumph**

38. A.S. was admitted to Triumph on September 17, 2020.

39. In a series of Explanation of Benefits Statements for September – December 31, 2020, Quartz denied A.S.'s treatment for "Precertification/authorization/notification absent."

40. Contradicting its stance that services could not be approved due to a lack of preauthorization, in a series of letters sent to Triumph, Quartz simultaneously authorized services from September 17, 2020, through October 20, 2020.

41. In a letter dated October 21, 2020, Quartz denied A.S.'s treatment at Triumph stating in part,

> We received a request on 10/20/2020 from Triumph Youth Services to provide an authorization for Mental Health Residential Treatment from 10/20/2020 to 10/27/2020.
> After reviewing all relevant clinical information, the Physician Reviewer has determined that the service does not meet the criteria for Medically Necessary Services. This is due to the following –
>> Based on the clinical information provided you have had appropriate behavior in the program; your mood has been stable; and there are no

6

> acute safety issues related to yourself or others. There have been no medication changes. Current symptoms do not meet medical necessity criteria for continued residential level of care. Current symptoms do not meet medical necessity criteria for continued residential level of care. Therefore, the request for coverage for Mental Health Residential Treatment is denied. It is recommended that you transition to an Intensive Outpatient level of care.

42. On March 24, 2021, R.S. and S.S. filed an appeal on behalf of A.S.

43. The 40-page appeal states in part:

> Throughout this appeal, we will provide overwhelming evidence demonstrating that [A.S.]'s residential treatment at Triumph remains absolutely medically necessary.
> …
> [A.S.] continued to struggle with behavioral health issues and substance abuse urges throughout his stay at Triumph. The multidisciplinary therapeutic approach, only available in a residential facility is uniquely able to provide [A.S.] with treatment that is not only safe, but *effective.* [A.S.] desperately needs this extended intermediate residential intervention in order to learn how to express and process his emotions; learn healthy coping mechanics for his depression, ADHD, identity issues, conduct disorder, and substance abuse; and practice implementing these strategies in his everyday life.[1]

44. They reminded Quartz that the Plan was subject to ERISA and that they were entitled to certain protections during the review process, including a full, fair, and thorough review conducted by an appropriately qualified reviewer, which took into account all of the information they provided, referenced the specific plan provision on which the denial was based, and gave them the information necessary to perfect the claim.

45. R.S. and S.S. continued to state that Quartz appeared to have violated MHPAEA writing:

> …Quartz has denied [A.S.]'s treatment based on acute severity of illness requirements. In doing so, it appears that Quartz has intentionally utilized the InterQual criteria in order to impose acute requirements on subacute or intermediate behavioral health treatment. [] By contract, we were unable to find any indication that Quartz requires patients to exhibit acute medical symptoms in order to qualify for treatment in an intermediate facility.
> …

---

[1] Emphasis in original

> Therefore, it appears that these acute severity of illness requirements being imposed on our intermediate behavioral health benefits constitutes an unlawful [non-quantitative treatment limitation] based on inequitable medical management standards that does not apply to comparable intermediate medical benefits.

46. They argued that Quartz's criteria violated generally accepted standards of medical practice and noted that Quartz's criteria for acute level hospitalization and residential treatment were remarkably similar. They included a table with the appeal directly comparing these admission criteria.

47. They wrote that residential treatment centers are not expected to treat nor equipped to handle individuals suffering from acute level symptoms. They argued that other courts had found other insurers' proprietary guidelines violated generally accepted standards of medical practice in this same manner.

48. They stated that MHPAEA required insurers to ensure benefits were administered at parity between mental health and analogous medical/surgical services. They identified skilled nursing, inpatient rehabilitation, and hospice as some of the medical or surgical analogues to the mental health treatment.

49. They argued that Quartz did not require individuals receiving treatment in skilled nursing, rehabilitation, or hospice facilities to satisfy acute level symptoms. They enclosed copies of Quartz's skilled nursing and hospice services medical policies to support this claim.

50. They asked Quartz to perform a parity compliance analysis of the Plan and to provide them with written copies of any and all documentation used.

51. R.S. and S.S. also stated that A.S.'s treatment had been recommended by his treatment team and included letters of medical necessity with the appeal to show that A.S.'s treatment was appropriate.

52. In a letter dated January 26, 2021, Frederick Harris, MA, LPC stated in part,

    > Based on information provided from [A.S.] and his parents during the assessment process and continued individual sessions; I diagnosed and provided treatment for Oppositional Defiant Disorder (Severe) and Cannabis Use Disorder (Severe).
    > …
    > Due to the increased outburst and disruptive behaviors, it was recommended for his parents to consider other inpatient treatment options (possibly outside Madison). There were too many negative influences that presented barriers for [A.S.] to be successful.

53. The appeal included over 200 pages of A.S. medical records from Triumph. These records showed that A.S. continued to struggle even while in the controlled environment of a residential treatment center.

54. The appeal letter itself quotes several portions of these medical records, stating in part,

    > 11/09/2020 – Individual Therapy Note
    > Data: Discussed client's past week, which he reported as being difficult. Client reports cycling through negative throughs about being in program. Negative thoughts got to the point of "what's the point of living?"
    > …
    > 11/12/2020 – Individual Therapy Note
    > Data: Short session make up and check in. Client reports doing well. Discussed ADHD meds – parents want him to take, client reports strong desire to refuse. Client reports not liking the way they make him feel, but also admitted that refusal is from defiance.
    > …
    > 12/20/2020 – Treatment Plan Objectives
    > Decision making: Client seems to continue to be in the contemplative stage of change. He has acknowledged the damage that substances have done to his family relationships and endorses long term sobriety. He has yet to develop significant coping skills to create this change, but seems ready to do so…
    > …
    > 12/20/2020 – Individual Therapy Note
    > Client endorsed returning to drug and alcohol use after program, but doesn't want it to hurt his family relationship. Client is struggling with cravings, including using dreams. …
    > …
    > 01/2021 – Treatment Plan Objectives
    > Decision making: Client participates in individual, group and family therapy, yet does not fully engage. His depression has made it difficult for him to do more than minimum requirements…Client has recently agreed to speak to the psychiatrist about anti-depressants, which he has resisted in the past.

> …
> 02/2021 – Treatment Plan Objectives
> Decision making: Client participates in individual, group and family therapy and has recently begun to engage more fully. He has been doing phase work and is seeking to progress in the program. He has begun taking an anti-depressant, but reports it making him excessively sleepy in the mornings.

55. They stated that A.S. suffered from substance use issues as well as mental health problems and included a report from the U.S. Surgeon General on the particular challenges involved in treating addiction in individuals at a young age, especially in a home environment.

56. They stated Quartz had not taken into account whether A.S. could be effectively treated at a lower level of care and was trying to compel treatment for him at a lower level of care to protect its financial bottom line while disregarding the fact that A.S. had attempted outpatient care in the past and it had not been effective.

57. In the event the denial was upheld, they requested to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits they were seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria used in the determination (as well as their medical or surgical equivalents, whether or not these were used), any reports or opinions regarding the claim from any physician or other professional who evaluated it, along with their names, qualifications, and denial rates. (collectively the "Plan Documents")

58. Lastly, R.S. and S.S. stated,

> We would like to thank the reviewer in advance for their time and consideration in this matter. We greatly look forward to your response within the 30-day timeframe outlined in our plan, and to a full reversal of your adverse benefit determination for the dates of service in question.

59. In a letter dated April 12, 2021, Quartz responded to the Plaintiff's appeal and referred to it as an urgent appeal request, despite R.S. and S.S. not requesting an urgent evaluation. This letter stated in part,

> You have requested an urgent review of this grievance.
> …
> The information reviewed does not indicate the standard appeal process would result in serious jeopardy to your life or health of your ability to regain maximum function. The request is not regarding essential treatment for which the lack thereof would cause these circumstances. For these reasons, your appeal will be processed within the standard 30 days.
> As part of the appeal process, your appeal will be presented to the Reconsideration Committee on Wednesday morning, May 5, 2021…

60. In a letter dated May 28, 2021, Quartz denied A.S.'s treatment at Triumph for October 20, 2020, through April 30, 2021, stating in part,

> **Background Information:** Your appeal request received on April 6, 2021 was evaluated by the Reconsideration Committee on May 26, 2021. Your request for residential behaoiral [sic] health care services from Triumph Youth Services from October 20, 2020 – April 30, 2021 was denied because the medical criteria for coverage was not met.
> **Final Internal Adverse Benefit Determination:** Based on the review of the information, the Reconsideration Committee has made a compromised determination regarding the request for the provision of coverage for residential treatment from Triumph Youth Services October 20, 2020 – April 30, 2021 for the treatment of Major Depressive Disorder. Based on medical information, it was determined that [A.S.] met criteria for residential care from October 20, 2020 – December 28, 2020 due to his displays of anger and physical outbursts. The claims from October 20, 2020 – December 28, 2020 will be reprocessed to pay accordingly to the benefits available at the time services were rendered. However, there was no documentation [A.S.] exhibited any serious emotional disturbance from December 29, 2020 – April 30, 2021.[2]

61. The Plaintiff exhausted his pre-litigation appeal obligations under the terms of the plan and ERISA.

---

[2] Emphasis in original

62. The denial of benefits for A.S.'s treatment was a breach of contract and caused R.S. to incur medical expenses that should have been paid by Quartz in an amount totaling over $300,000.00.

63. Quartz failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities despite R.S.'s request.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

64. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Quartz, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the plan. 29 U.S.C. §1104(a)(1).

65. Quartz failed to provide coverage for A.S.'s treatment in violation of the express terms of the plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

66. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiff in the pre-litigation appeal process. 29 U.S.C. §1133(2).

67. The denial letters produced by Quartz do little to elucidate whether Quartz conducted a meaningful analysis of the Plaintiff's appeals or whether it provided them with the "full and fair review" to which they are entitled. Quartz failed to substantively respond to the issues presented in R.S.'s appeals and did not meaningfully address the arguments or

concerns that the Plaintiff raised during the appeals process.

68. In fact, Quartz's denial letters rely on formulaic recitations and do not address the arguments raised by R.S. in any capacity.

69. Quartz breached their fiduciary duties to A.S. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in A.S.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of A.S.'s claims.

70. The actions of Quartz in failing to provide coverage for A.S.'s medically necessary treatment are a violation of the terms of the plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

71. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Quartz's fiduciary duties.

72. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

73. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

74. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

75. The explicit language of the SPD, one of the governing plan documents, states that the Defendant will utilize generally accepted standards of medical practice that are "in accordance with accepted standards of medical, surgical or psychiatric practice" when evaluating the medical necessity of treatment for purposes of evaluating coverage under the plan of mental health claims.

76. The medical necessity criteria used by Quartz for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria that Quartz applies to analogous intermediate levels of medical or surgical benefits.

77. In addition, Quartz analysis and processing of the claim failed to take into consideration the patient's safety if he returned to a home environment as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided.

78. Generally accepted standards of medical practice for medical and surgical rehabilitation under the plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.

79. Comparable benefits offered by the plan for medical/surgical treatment analogous to the benefits Quartz excluded for A.S.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

80. For none of these types of treatment does Quartz exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

81. When Quartz receives claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the plan based on generally accepted standards of medical practice.

82. Quartz evaluated A.S.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice.

83. This process resulted in a disparity because Quartz denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

84. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, Quartz's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that A.S. received.

85. Quartz's improper use of acute inpatient medical necessity criteria is revealed in the statements in Quartz's denial letters such as, "your mood has been stable; and there are no acute safety issues related to yourself or others. There have been no medication changes."

86. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that A.S. received.

87. Quartz does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria to receive plan benefits.

88. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

89. Quartz cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice.

90. Quartz must and does acknowledge that it adheres to generally accepted standards of medical practice when it evaluates the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

91. As another example of the Quartz's improper application of its criteria to evaluate the treatment A.S. received, the Defendant relied on assertions such as, "you have had appropriate behavior in the program; your mood has been stable…There have been no medication changes" as a justification to deny treatment.

92. In fact, becoming stable and not needed a medication change serves as an indicator rather than a contra-indicator of the medical necessity of treatment in a non-acute residential setting.

93. In this manner, the Defendant violates 29 C.F.R. §2590.712(c)(4)(i) because the terms of the plan and the medical necessity criteria utilized by Quartz, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

94. Quartz did not produce the documents the Plaintiff requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiff's allegations that Quartz was not in compliance with MHPAEA.

95. The violations of MHPAEA by Quartz is a breach of fiduciary duty and give the Plaintiff the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

    (a) A declaration that the actions of the Defendant violates MHPAEA;

    (b) An injunction ordering the Defendant to cease violating MHPAEA and requiring compliance with the statute;

    (c) An order requiring the reformation of the terms of the plan and the medical necessity criteria utilized by the Defendant to interpret and apply the terms of the plan to ensure compliance with MHPAEA;

    (d) An order requiring disgorgement of funds obtained by or retained by the Defendant as a result of their violations of MHPAEA;

    (e) An order requiring an accounting by the Defendant of the funds wrongly withheld from participants and beneficiaries of the plan as a result of the Defendant's violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendant to provide payment to the Plaintiff as make-whole relief for their loss;

(g) An order equitably estopping the Defendant from denying the Plaintiff's claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendant to the Plaintiff for his loss arising out of the Defendant's violation of MHPAEA.

96. In addition, Plaintiff is entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiff seeks relief as follows:

1. Judgment in the total amount that is owed for A.S.'s medically necessary treatment at Triumph under the terms of the plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiff's Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 7th day of June, 2022.

By    s/ Brian S. King
     Brian S. King
     Attorney for Plaintiff

County of Plaintiff's Residence:
Dane County, Wisconsin.