IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

R.S., individually and on behalf of A.S., a minor,

                    Plaintiff,                                OPINION AND ORDER

        v.
                                                             22-cv-418-wmc

QUARTZ HEALTH BENEFIT PLANS CORPORATION,

                    Defendant.

Plaintiff R.S. filed this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1491, against defendant Quartz Health Benefit Plans Corporation, the benefit claims administrator for plaintiff's employee-sponsored health benefits plan. In particular, plaintiff claims that Quartz violated ERISA by denying coverage for his son's residential treatment for mental health and substance abuse in violation of the terms of his health benefits plan and the Mental Health Parity and Addiction Equity Act.

The parties' cross motions for summary judgment are pending before the court. (Dkt. #22 and Dkt. #26.) For the reasons discussed below, the court finds that Quartz's benefits determination was arbitrary and capricious and violated ERISA. Therefore, at summary judgment, plaintiff's motion will be granted and Quartz's motion will be denied with respect to R.S.'s ERISA claim, and the case will be remanded to Quartz for further proceedings consistent with this opinion. However, the court will grant defendant's motion as to plaintiff's claim under the Mental Health Parity and Addiction Equity Act.

UNDISPUTED FACTS[1]

**A. The Parties**

Plaintiff R.S. was a participant in an employee health benefit plan insured and administered by defendant Quartz Health Benefits Plan Corporation ("the Plan").  His son, A.S., was R.S.'s covered dependent under the same plan.  The plan granted Quartz discretion to interpret and apply that plan's terms, limitations and exclusions in making benefits determinations.

**B. The Health Benefit Plan**

The Plan provides coverage for "Behavioral Health and Substance Abuse Services," which it defines as:

> The treatment of psychiatric Illness or substance use disorders.
> This treatment is provided on an inpatient, outpatient, transitional and emergency care basis.

(R. 103.)  However, the Plan only covers Behavioral Health and Substance Abuse Services that are "Medically Necessary," which it defines as "Health care services or supplies needed to prevent, diagnose or treat an Illness, Injury, condition, disease or its symptoms and that meet accepted standards of medicine."  (R. 113.)  The Plan excludes treatment that is not medically necessary, which it defines as "Any service that is not required in accordance with accepted standards of medical, surgical or psychiatric practice."  (R. 144.)

---

[1] The following facts are drawn from the parties' proposed findings of fact and responses, as well as the underlying evidence submitted by the parties, and are deemed undisputed for purposes of summary judgment unless otherwise noted.  Citations to (R.) are to the administrative record.  (Dkt. #17.)

The Plan further identifies the relevant factors in making a "Medically Necessary" determination as:

> 1. Consistent with the symptoms or diagnosis and treatment of a Member's Illness or Injury;
>
> 2. Appropriate under the standards of acceptable medical practice to treat that Illness or Injury;
>
> 3. Not solely for the convenience of the Member, Physician, Hospital or other health care Provider;
>
> 4. The most appropriate supply or level of service that can be safely provided to the Member and which accomplishes the desired end result in the most economical manner; and
>
> 5. Not primarily for cosmetic improvement of the Member's appearance, regardless of psychological benefit.

(R. 113.)

The Plan also contemplates that while the "Member's Attending Physician makes decisions regarding service and treatment," a "physician appointed by Quartz" will "serve as the Plan's final decision-maker" -- defined as the Plan's "Medical Director" -- and be vested with the authority and discretion to make determinations on what "service, treatment, procedure, drug, device or supply" is "Medically Necessary and eligible for coverage under the Plan."

> The Plan, through its Medical Director, using criteria developed by Medical Management and other recognized sources, has the authority to determine whether a service, treatment, procedure, Prescription Drug, device or supply is Medically Necessary and eligible for coverage under the Plan.

(R. 112–13.)

3

During the relevant time period, Quartz relied on the screening guidelines known as InterQual Criteria for Child and Adolescent Psychiatry ("InterQual criteria") to review the medical necessity of a minor's inpatient treatment at a residential treatment facility. InterQual screening guidelines for inpatient treatment at a residential treatment facility are divided into two groups: (1) those designated for screening treatment for an eating disorder; and (2) those designated for screening treatment for a "serious emotional disturbance or autism spectrum disorder or intellectual disability."[2] The InterQual criteria are further divided by length of stay: (a) initial admission/week one; (b) week two criteria; and (c) extended stay criteria for inpatient stays of three weeks or more.

For an "extended stay" under (c) at a residential treatment facility, the InterQual criteria provide screening guidelines to determine if the patient is considered "not clinically stable for discharge," including a list of symptoms demonstrated within the last week. In particular, at week three or more, InterQual's guidelines included the following list of symptoms, which if displayed within the last week, demonstrate clinical instability: "aggressive or assaultive behavior; angry outbursts; depersonalization or derealization; destruction of property; easily frustrated and poor impulse control; homicidal ideation without intent; hypervigilance or paranoia; nonsuicidal self-injury; persistent rule violations; psychiatric medication refractory or resistant and symptoms increasing or persisting; psychomotor agitation or retardation; runaway from facility or while on home pass; sexually inappropriate; or suicidal ideation without intent."

---

[2] Quartz apparently applied the InterQual criteria for "serious emotional disturbance or autism spectrum disorder or intellectual disability" for substance abuse disorders, as well as other mental and behavioral health issues.

4

### C. A.S.'s Residential Treatment

Since kindergarten, A.S. has struggled with behavioral and mental health difficulties.  He was diagnosed with attention deficit hyperactivity disorder in fifth grade; and later in high school, he was diagnosed with an "extreme" case of "oppositional defiant disorder."  As a teenager, A.S. engaged in oppositional, disruptive, violent and increasingly dangerous and destructive behaviors, and eventually began using and selling drugs and was involved in gang activity, stealing, absenteeism, fighting with his classmates and others, threatening physical violence against his parents, run-ins with the police, and other criminal behaviors.  Relatedly, A.S. was failing his classes and had thoughts of killing himself.  During the Covid-19 pandemic in particular, when he was attending school from home, he used drugs nearly every day, and stole hundreds to thousands of dollars from his parents.  When confronted, A.S. also attacked his father, destroyed parts of his car, and threatened to have his friends kill him.  After therapy and other interventions were unsuccessful, A.S.'s therapist recommended that his parents consider inpatient treatment options.

On September 17, 2020, A.S. was admitted to Triumph Youth Services, a mental health facility in Brigham City, Utah.  When admitted to Triumph, A.S. was diagnosed with the following: (1) conduct disorder, adolescent onset (312.82); (2) ADHD, combined type (314.01); (3) cannabis use disorder, severe (304.40); and with other conditions for possible focus of clinical attention: (4) parent-child relationship problems (V61.20); and (5) academic or educational problems (V62.3).  In a statement describing why A.S. needed psychological rehabilitative services, Triumph specifically wrote:

> Client has a history of violent and criminal behavior. He has engaged in theft, property destruction, verbal threats and fighting. He uses a significant amount of marijuana on a daily basis and other drugs on a less frequent basis. He is defiant to parents and other authority figures and refuses to obey home or school rules.

(R. 439.)  One of the primary goals of A.S.'s treatment plan at Triumph was:

> Decision making and long term sobriety: Client will learn skills necessary to make appropriate decisions such as abstinence from drugs and alcohol, zero incidents in school, home, and program, and choosing appropriate peers and activities.  This will be measured by clean UAs, zero charges, planning activities, and consistent appropriate behavior."

(*Id.*)  While at Triumph, A.S.'s medical records further describe the following incidents and observations related to this goal:

> • On December 29, 2020, staff at Triumph noted that A.S. had just "recently begun to do program work in order to progress," and that he was "beginning to understand the benefits of long term sobriety, but has not yet made a full commitment to that goal." Staff further noted that A.S., "has verbally acknowledged the problematic nature of his substance use and other behaviors, and has expressed a desire to make changes. He seems to be in the contemplative stage of change." (R. 443.)

> • On December 30, 2020, a therapist noted that A.S. had "endorsed returning to drug and alcohol use after program, but doesn't want it to hurt his family relationship. Client is struggling with cravings, including using dreams." (R. 290.)

> • On A.S's January 2021 treatment plan, staff noted that A.S. "currently needs to overcome his depression through application of [cognitive behavioral therapy] skills and possibly with medication. At that point he will need to reengage in other program and therapeutic requirements in order to develop the skills to achieve long term sobriety and healthy relationships." (R. 291.)

6

• On A.S.'s February 2021 treatment plan, staff noted that A.S. "needs to continue to develop the skills and terms necessary for long term sobriety and a healthy family relationship." (R. 292.)

**D. Quartz's Coverage and Denials**

Quartz initially covered A.S.'s treatment at Triumph from September 17 through October 20, 2020, a total of 34 days. However, on October 21, 2020, approximately five weeks into inpatient treatment, it sent A.S. a letter denying his request for further residential treatment on the grounds that it was not medically necessary, stating:

> Based on the clinical information provided, you have had appropriate behavior in the program; your mood has been stable; and there are no acute safety issues related to yourself or others. There have been no medication changes. Current symptoms do not meet medical necessity criteria for continued residential level of care. Therefore, the request for coverage for Mental Health Residential Treatment is denied. It is recommended that you transition to an Intensive Outpatient level of care.
>
> We use clinical information to make decisions about medical necessity. We also use Interqual Behavioral Health Criteria, Child and Adolescent Psychiatry – Residential.

(R. 56.)

In March 2021, plaintiffs appealed Quartz's denial of A.S.'s October 20 to October 27, 2020, inpatient stay at Triumph and requested "a full level one member appeal review of the adverse benefit determination for October 20, 2020 through [A.S.'s] future date of discharge." (R. 267.) The appeal documents submitted by plaintiffs to Quartz were extensive, consisting of more than 700 pages. Plaintiffs wrote that A.S. continued to need treatment for his substance use disorder symptoms, his behavioral health symptoms, and the volatility caused by the combination of the two. In particular, plaintiffs accused Quartz

of not considering A.S.'s "co-occurring conditions" and addressing his difficulties with substance abuse. A.S. also included assertions that Quartz had violated the Mental Health Parity and Addiction Equity Act by covering treatment for skilled nursing facility and hospice care as medical/surgical benefits, but denying comparable behavioral health benefits received in a residential treatment facility.

Charlotte Ladd, M.D., apparently designated as Quartz's "Medical Director" for purposes of plaintiffs' appeal, reviewed the documentation submitted with the request to extend coverage for A.S.'s stay at Triumph. Dr. Ladd specifically referenced the InterQual criteria applicable to an inpatient stay of three weeks or more as well as A.S.'s medical records through March 2021. Regarding her review, Dr. Ladd made the following notes:

> During the first few months, the member struggled to engage. On Oct 12, 2020 (p 367), he had his first incident report in which he squared off with a peer, was redirected, squared off again, got punched, and continued to be confrontational afterward.
>
> His last approved date of residential treatment was October 19, only one week after his incident report.
>
> He had further incident reports on:
>
> Nov 6: disruptive in class repeatedly (p 352)
>
> Nov 17: disruptive, yelling curse words repeatedly in class (p 332)
>
> Dec 3: hit a staff member hard enough to cause his hand to swell. (p 328)
>
> There are no incident reports after Dec 3. There is evidence from documentation that he began to engage in treatment in earnest between late Oct with clear improvement by late December.

> Since he continued to display inappropriate anger and physical outbursts through Oct, Nov and early December, it is appropriate to approve residential treatment during this time frame. Since his outbursts were occurring about every 2 weeks, it is reasonable to consider him stable enough to step down to a lower level of care 3 weeks after his last outburst. This date would be Dec 24. Given that d/c during a holiday may be triggering, it is reasonable to approve treatment through Dec 27 with member qualifying for d/c on Dec 28. Dates of service from Dec 29–April 28 do not meet medical necessity criteria for residential level of care as there is no documentation that the member exhibited "serious emotional disturbance" during this time.

(R. 173.)

A.S.'s case was heard and reviewed by the Quartz Reconsideration Committee on May 26, 2021. Quartz's Reconsideration Committee followed Dr. Ladd's recommendation and the Committee's decision was provided to A.S. in a letter dated May 28, 2021. The letter stated, in part, that the Committee had determined that A.S. "met the criteria for residential care from October 20, 2020 – December 28, 2020 due to his displays of anger and physical outbursts," so those claims would be reprocessed to pay benefits for that time period. However, "there was no documentation [that A.S.] exhibited any serious emotional disturbances from December 29, 2020 – April 30, 2021," so the denial of coverage was affirmed for his residential treatment during that time frame. (R. 20.) The letter further stated that the Committee's final benefit determination was based on "InterQual March, 2020 Release BH: Child and Adolescent Child and Adolescent Psychiatry Criteria" and the Certificate of Coverage.

As a result of the Reconsideration Committee's decision, the previously denied claims for A.S.'s residential stay from October 20, 2020 through December 28, 2020, were

reprocessed and paid according to A.S.'s benefit coverage under the Plan. Having exhausted his prelitigation appeals, R.S. initiated this lawsuit on A.S.'s behalf.

OPINION

Plaintiff[3] claims that defendant:  (1) violated ERISA by improperly denying his claim for continued residential treatment benefits from December 29, 2020 through April 28, 2021, under the Plan's terms and 29 U.S.C. § 1132(a)(1)(B); and (2) violated the Mental Health Parity and Addiction Equity Act of 2008, 29 U.S.C. § 1185a ("the Parity Act"), by evaluating residential treatment claims more stringently for those seeking behavioral health and substance use treatment than for those needing medical/surgical treatment in a skilled nursing facility.  The court first addresses the denial of benefits claim, followed by the Parity Act claim.

ERISA "was enacted to promote the interests of employees and their beneficiaries in employee benefit plans." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830 (2003).  A plan participant or beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The first question is what standard of review applies to plaintiff's ERISA denial of benefits claim.

The default rule under ERISA is that courts apply *de novo* review to denials of benefits, *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), but most benefit

---

[3] Throughout the remainder of this opinion, references to "plaintiff" are to A.S., as his claim for benefits is at issue in this case.

plans give the administrator "discretionary authority" to interpret the plan and to decide claims for benefits. *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 860–61 (7th Cir. 2009) (citing *Firestone*, 489 U.S. at 115). Courts review exercises of such discretionary authority under a deferential "arbitrary-and-capricious" standard. *Zall v. Standard Ins. Co.*, 58 F.4th 284, 291 (7th Cir. 2023).[4] "Arbitrary-and-capricious review turns on whether the plan administrator communicated 'specific reasons' for its determination to the claimant, whether the plan administrator afforded the claimant 'an opportunity for full and fair review,' and 'whether there is an absence of reasoning to support the plan administrator's determination.'" *Id.* (quoting *Majeski v. Metropolitan Life Ins. Co.*, 590 F.3d 478, 484 (7th Cir. 2009); and *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 832–33 (7th Cir. 2009)). This standard of review is ordinarily highly deferential, and the court must uphold the plan administrator's decision so long as the administrator "makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts." *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 606 (7th Cir. 2007).

Here, plaintiff acknowledges that the Plan gives discretionary authority to defendant to make decisions of medical necessity. Nonetheless, plaintiff argues that the court should conduct a *de novo* review because defendant violated ERISA's procedural requirements when evaluating his claim and appeal. *See Fessenden v. Reliance Standard Life Ins. Co.*, 927 F.3d 998, 999–1000 (7th Cir. 2019) ("When a plan administrator commits

---

[4] This standard is also used interchangeably by the parties and the court as an "abuse of discretion" standard. *See Rayhourne v. Cigna Life Ins. Co. of New York*, 576 F.3d 444, 449 (7th Cir. 2009) (the "arbitrary-and-capricious standard . . . is synonymous with abuse of discretion" in ERISA cases).

a procedural violation, however, it loses the benefit of deference and a *de novo* standard applies.")   Among other things, plaintiff argues that defendant committed procedural violations by failing to:  (1) provide plaintiff access to all documents on which defendant relied in denying benefits; and (2) address his substance abuse disorder meaningfully in determining whether continued residential treatment was medically necessary.   Whether or not these are *procedural* errors, as opposed to substantive challenges to defendant's decision denying benefits under the Plan, the court need not resolve this dispute because, as discussed below, defendant's decision denying benefits was arbitrary and capricious under even the more deferential standard.


## I     Merits of Benefits Claim under Plan

Under ERISA, a plan administrator denying a claim for benefits must provide "adequate notice" to any claimant whose claim has been denied and a "full and fair review" of the decision denying the claim.  29 U.S.C. § 1133 (1) & (2); *see also Zall v. Standard Ins. Co.*, 58 F.4th 284, 292 (7th Cir. 2023) (explaining this process); *David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1298–1301 (10th Cir. 2023) (same); *D.K. v. United Behavioral Health*, 67 F.4th 1224, 1235–36 (10th Cir. 2023) (same).  "Adequate notice" includes "notice in writing ... setting forth the specific reasons for [the] denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1).  The regulations further specify that the notice of the denial of benefits must contain, among other things, "[r]eference to the specific plan provisions on which the determination is based" and "[a] description of any additional material or information necessary for the

12

claimant to perfect the claim and an explanation of why such material or information is necessary." 29 C.F.R. § 2560.503-1(g)(ii)–(iii).[5]  As for the "full and fair review," the regulations require that the administrative review procedures "[p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim." 29 C.F.R. § 2560.503-1(h)(iv).

Plaintiff contends that defendant failed to provide adequate notice or a full and fair review for two primary reasons.  *First*, he argues that defendant was required to provide copies of the opinions and recommendations of Dr. Ladd, Quartz's designated Medical Director, *before* denying plaintiff's appeal of the denial of benefits.  Instead, defendant provided Dr. Ladd's notes and recommendations only after plaintiff filed this lawsuit.  The court agrees.  Under ERISA regulations, when a claimant appeals an adverse benefit determination, a "full and fair review" requires the plan administrator to "provide the claimant, free of charge, with any new or additional evidence considered, relied upon, or generated by the plan or issuer (or at the direction of the plan or issuer) in connection with the claim." 29 C.F.R. § 2590.715–2719(b)(2)(ii)(C)(1).  Moreover, this "evidence must be provided as soon as possible and sufficiently in advance of the date on which the notice of final internal adverse benefit determination is required to be provided … to give the claimant a reasonable opportunity to respond prior to that date." *Id.*  Here, defendant concedes that it failed to provide Dr. Ladd's opinions and recommendations to plaintiff

---

[5] 29 C.F.R. § 2560.503-1 applies to group health plans offering disability benefits.  However, under 29 C.F.R. § 2590.715-2719, group health insurance plans are subject to the same requirements.

before making its final decision on plaintiff's appeal, despite relying primarily, if not exclusively, on those opinions.

Nonetheless, defendant argues that Dr. Ladd's notes and opinions were not really new or additional "evidence," because she merely summarized evidence in the record and provided her own analysis and opinion regarding how that evidence fit the Plan's requirements for residential care. This argument is unpersuasive. Even if Dr. Ladd merely analyzed existing evidence, she certainly provided an opinion that contradicted those of plaintiff's treating providers at Triumph regarding his need for continued residential treatment. In particular, Dr. Ladd concluded that residential treatment was not "medically necessary" after December 29, 2020, because plaintiff had not had a "serious emotional disturbance" in the recent weeks. (R. 173.) Defendant then relied on Dr. Ladd's synthesis of evidence *and* her conclusions to deny plaintiff's appeal for benefits.

In contrast, plaintiff's primary psychologists at Triumph noted in December of 2020, as well as February and March of 2021, that plaintiff should remain in residential treatment because he had not yet developed skills to manage his depression or maintain stability and sobriety at home. (Dkt. #17-1 at 138; #17-2, at 39–40.) If plaintiff had been afforded the full and fair review to which he was entitled, including access to Dr. Ladd's report, he would have had the opportunity to respond to her report. It is also quite probable that he would have been able to provide additional opinions from his treating providers and other experts regarding his continued need for residential treatment, particularly given his history of profound early onset behavioral and mental health issues, long-standing addictions, and the interplay of both. *See, e.g.*, *Zall*, 58 F.4th at 297

14

(claimant prejudiced by the administrator's failure to provide a copy of a consulting physician's report that it relied upon to deny benefits); *Jette v. United of Omaha Life Ins. Co.*, 18 F.4th 18 (1st Cir. 2021) (same).

*Second*, even if defendant's failure to provide Dr. Ladd's report to plaintiff timely was not sufficient reason to remand this case for further review by itself, plaintiff argues that defendant failed to consider his severe substance abuse disorder, including the evidence plaintiff submitted with his appeals regarding his substance abuse, in determining whether continued residential treatment was medically necessary.  Plaintiff points to his appeal letter, in which he expressly asked defendant to consider:  (1) how his substance abuse disorder contributed significantly to the danger he posed to himself and others; and (2) how his drug addiction was among the two principal reasons he needed the rehabilitative services that Triumph was able to provide.  (R. 298–300.) Yet neither Dr. Ladd, nor defendant in its decision letter, addressed plaintiff's substance abuse disorder at all.

Given its length and comorbidity, defendant's failure to address plaintiff's substance abuse disorder as powerful evidence supporting his need for ongoing, residential treatment was arbitrary and capricious.  As the Seventh Circuit has emphasized, "procedural reasonableness is the cornerstone of the arbitrary-and-capricious inquiry." *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 484 (7th Cir. 2009).  This does *not* mean that a plan administrator must "delve into medical evidence that is irrelevant to its primary concern" or "annotate every paragraph of a thousand-page medical record," "[b]ut a plan administrator's procedures are not reasonable if its determination ignores, without

explanation, substantial evidence that the claimant has submitted that addresses what the plan itself has defined as the ultimate issue." *Id.* Here, plaintiffs submitted, and defendant failed to address, evidence that residential treatment was medically necessary to treat plaintiff's conduct disorder, ADHD, substance abuse disorder, *and* their comorbidity. The Seventh Circuit has further observed that circuit precedent "unambiguously requires a plan administrator to 'address any reliable, contrary evidence submitted by the claimant.'" *Id.* (citations omitted).

Though neither is persuasive, defendant makes two arguments of its own in response. First, it argues plaintiff presented no medical records showing his substance abuse required inpatient treatment. More specifically, defendant argues that: "Triumph itself did not consider A.S.'s cannabis use a diagnosis that required inpatient treatment." (Dft.'s Br. (dkt. #34) 9.) On its face, this is untrue. Throughout plaintiff's treatment records at Triumph, plaintiff's treating providers stated that one of plaintiff's *primary* treatment goals was "long term sobriety," and developing skills before release was crucial to "make appropriate decisions such as abstinence from drugs and alcohol, zero incidents in school, home, and program, and choosing appropriate peers and activities." (R. 439–40.) Plus, his primary diagnosis from Triumph has always been identified as "cannabis use disorder, severe," (R. 80), as have his requests for continuation of coverage from defendant. (R. 210). In particular, from December 2020 to February 2021, Triumph noted that plaintiff continued to struggle with substance abuse concerns, with him openly endorsing on December 30, 2020, that he would return to drug and alcohol use if he left Triumph. (R. 290.) Further, his therapy notes and treatment plan updates during the same time

period identified the "reason for continued service" was plaintiff's need "to overcome depression through CBT and possibly medication, [as he] was no longer engaging with program and had not developed skills to achieve long term sobriety." (R. 291–92.) Accordingly, plaintiff continued to receive substance abuse disorder treatment throughout his inpatient stay at Triumph. (R. 454, 462, 464, 489.) Regardless, defendant's assertion that plaintiff presented *no* evidence to support his claim that inpatient treatment for his substance abuse disorder was medically necessary is patently false.[6]

As for defendant's second argument, it claims to have considered plaintiff's cannabis use when reviewing his case, pointing to two documents as support. To begin, they point to Dr. Ladd's notes, in which she reviewed "the therapy notes, treatment plans, incident reports, and provider notes from admission through March." (R 173.) Defendant argues that because those records *included* multiple references to plaintiff's cannabis use disorder before admission and discussions of it during his therapy sessions, Dr. Ladd necessarily considered plaintiff's substance abuse. However, a vague reference that all records were reviewed is *not* sufficient under the circumstances here, in which plaintiff asked specifically and repeatedly that defendant consider his substance abuse treatment needs on appeal, just as his primary care providers did at Triumph. *See Majeski*, 590 F.3d at 484 ("By ignoring Majeski's key medical evidence, MetLife can hardly be said to have afforded her an opportunity for full and fair review, and its failure to address that evidence in its determination surely constitutes an absence of reasoning.")

---

[6]  Of course, even if true, this is one more reason why timely notice of defendant's Medical Director's ignoring this reason for treatment may have been material.

Defendant's other document is titled "Quartz Processing & Case Facts" in the administrative record, which summarizes plaintiff's medical records and claims on appeal and includes multiple references to plaintiff's substance abuse. (R. 92–93.) Because defendant asserts that this document was provided to the Quartz Reconsideration Committee, so the Committee must have considered plaintiff's substance abuse disorder in denying his appeal. (AR 92–93.) However, this document is similarly insufficient to show that defendant actually considered all of plaintiff's arguments and evidence related to one of two principal psychological disorders, much less comorbidity concerns, before denying his claim for benefits. *See Sadowski v. Tuckpointers Loc. 52 Health & Welfare Tr.*, 281 F. Supp. 3d 710, 720 (N.D. Ill. 2017) ("[A] mere statement that 'all relevant medical evidence had been considered' without addressing contrary evidence or the statements of the treating physician is insufficient.") (citing *Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 396 (7th Cir. 2009)). Moreover, the document cited is particularly unhelpful, as defendant does not explain who prepared the document, when it was provided to the Committee, or how the Committee used it in reaching its decision. Indeed, the document itself includes a summary of Dr. Ladd's recommendations and concludes by stating, "Dates of service from Dec 20-April 28 do not meet medical necessity criteria for residential level of care as there is no documentation." (R. 93.) Because defendant conceded already that the Committee accepted Dr. Ladd's recommendations, it is entirely possible that the Committee failed to consider separately *any* of plaintiff's evidence regarding his need for inpatient substance abuse disorder treatment. In short, defendant does not point to anything, even in its internal notes, suggesting that its reviewers seriously

considered plaintiff's substance abuse disorder or comorbidity with his conduct disorder and ADHD when evaluating his request for continued residential treatment.

Because defendant failed to adequately address plaintiff's substance abuse disorder in denying his request for benefits, defendant failed to provide plaintiff a "full and fair review," in rendering its decision "arbitrary and capricious."   Accordingly, the court will remand the case to the plan administrator for further findings and explanations.  *See Majeski*, 590 F.3d at 484 ("When a plan administrator fails to provide adequate reasoning for its determination, our typical remedy is to remand to the plan administrator for further findings or explanations."); *David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1310 (10th Cir. 2023) ("[Plan administrator's] failure to address [plaintiff's] substance abuse treatment as an independent ground for coverage thus supports reversing [] denial of Plaintiffs' benefits claims."); *Ian C. v. UnitedHealthcare Ins. Co.*, 87 F.4th 1207, 1222 (10th Cir. 2023) (denial of benefits was arbitrary and capricious where plan administrator "shut[] its eyes to the possibility that A.C. was entitled to benefits based on his substance abuse").

## II. Mental Health Parity and Addiction Equity Act

Plaintiff additionally claims that defendants violated the Mental Health Parity and Addiction Equity Act ("Parity Act"), 29 U.S.C. § 1185a(a)(3)(A)(ii), by applying more stringent internal criteria, beyond the terms of the plan itself, when determining whether residential mental health treatment is medically necessary, than when determining whether treatment at a skilled nursing facility is medically necessary.  As an amendment to ERISA, the Parity Act was "designed to end discrimination in the provision of coverage for mental

health and substance use disorders as compared to medical and surgical conditions in employer-sponsored group health plans and health insurance coverage offered in connection with group health plans." *Smith v. Golden Rule Ins. Co.*, No. 120CV02066JMSTAB, 2021 WL 930224, at *7 (S.D. Ind. Mar. 11, 2021) (quoting *Coal. for Parity, Inc. v. Sebelius*, 709 F. Supp. 2d 10, 13 (D.D.C. 2010)).  Under the Parity Act, therefore, insurers are prohibited from applying a financial requirement or treatment limitation to mental health and substance use disorder benefits that is more restrictive than what the insurer applies to medical or surgical benefits in the same classification. 45 C.F.R. § 146.136(c)(2)(i); *see also Midthun-Hensen on behalf of K.H. v. Grp. Health Coop. of S. Cent. Wisconsin, Inc.*, 110 F.4th 984, 986 (7th Cir. 2024) ("The Parity Act requires, as a general matter, that health insurers place coverage for mental conditions on an equal footing with coverage for physical conditions.")  A violation of the Parity Act may either be facial -- where the plain language of the plan identifies disparate coverage requirements -- or as-applied -- where a facially neutral provision of the plan is, in practice, applied disparately. *See Rula A. v. Aurora Health Care*, No. 20-CV-1816-JPS, 2021 WL 3116143, at *4 (E.D. Wis. July 22, 2021).

Here, plaintiff concedes that the Plan is not facially discriminatory, as it applies a "medical necessity" requirement to inpatient care for both mental health or substance abuse benefits and medical/surgical benefits.  (Plt.'s Br. (dkt. #26) 22.)  However, plaintiff contends that defendant's application of the "medical necessity" requirement to *plaintiff's* benefits claim was discriminatory.  *See Michael D. v. Anthem Health Plans of Ky., Inc.*, 369 F. Supp. 3d 1159, 1174-76 (D. Utah 2019) (neutral plan term like "medical necessity" can

20

lead to a Parity Act violation if plan administrator does not apply the term in parity between mental health and substance use coverage decisions and its medical/surgical analogue coverage decisions).

Specifically, plaintiff points out that claimants seeking residential treatment for mental or substance abuse treatment must show *acute* symptomology, such as "serious emotional disturbances," whereas those seeking coverage at an analogous skilled nursing facility are *not* required to show acute symptomology.  Instead, defendant provides coverage for skilled nursing facility treatment so long as a doctor determines it is necessary and it remains necessary based on accepted standards of medical practice.  (Dkt. #26-1) (defendant's "Skilled Nursing Facility Services").

A review of the InterQual criteria compared to the criteria for skilled nursing facilities appears to support plaintiff's assertion.  In particular, the InterQual criteria impose *significantly* more detailed requirements for continued residential treatment for behavioral health and substance use disorders than defendant's criteria for skilled nursing facilities.  (Dkt. #17 at 2–9 and Dkt. #26-1.)  For example, the InterQual criteria include a lengthy list of mental health symptoms to be considered, including self-injury, assaultive behavior, destruction of property, homicidal ideation, and other similarly acute safety issues, whereas the criteria for skilled nursing facility treatment appears to consider primarily whether a doctor has determined that such treatment is "necessary."  At least two district courts have accepted the argument that an insurer violates the Parity Act if it requires *acute* mental health or substance use disorder symptoms as a requirement for coverage for residential treatment while allowing or even requiring coverage of a skilled

nursing facility patient who manifests conditions or symptoms that are less than acute in nature. *See Jonathan Z. v. Oxford Health Plans*, No. 218CV00383JNPJCB, 2022 WL 2528362, at *20 (D. Utah July 7, 2022) (finding that a claims administrator "improperly required [a patient] to exhibit acute symptoms to qualify for RTC care" while not requiring "similarly acute symptoms for comparable medical-surgical treatment"); *Gary K. v. Anthem Blue Cross & Blue Shield*, No. 1:24-CV-07878 (ALC), 2025 WL 2782409, at *7 (S.D.N.Y. Sept. 30, 2025) ("[A]n alleged requirement to show acute symptoms for inpatient mental health treatment only is sufficient to state a Parity Act claim.").

That said, plaintiff's Parity Act claim is poorly developed. Specifically, plaintiff says he is bringing an "as applied" challenge based on defendant's denial of his claim for lack of acute symptoms, but then appears to challenge the InterQual criteria generally as being too focused on acute symptoms. As defendant points out, the Parity Act does not require insurers to apply the *same* limitations to treatment for behavioral health and substance use disorders as it does to treatment at a skilled nursing facility. Rather, the Parity Act requires insurers to apply *comparable* processes and strategies in determining applicable limitations. 29 C.F.R. § 2590.712(c)(4)(i). In this case, defendant claims to have relied on health care professionals to develop the applicable criteria, based on generally accepted standards of care, and plaintiff has failed to present any evidence to challenge defendant's assertion that the InterQual criteria are based on generally accepted standards of care. In fact, plaintiff did not respond at all to defendant's argument about the standard of care in the context of the Parity Act.

Perhaps plaintiff is arguing that defendant violated the Parity Act by focusing on a single acute symptom – the presence of "serious emotional disturbance" – in denying his claim, but this argument, too, is undeveloped. At summary judgment, plaintiff merely asserts, without further evidence and explanation, that mental health coverage is being treated more restrictively than its medical/surgical analogues. On this record, the court will deny plaintiff's motion for summary judgment on grant defendant's motion on plaintiffs' as-applied Parity Act claim. On remand, however, defendant should consider whether its review of plaintiff's claim satisfies the concerns raised by the court and plaintiff under the Parity Act, as the court's decision is not intended to foreclose plaintiffs from raising a new as-applied challenge under the Parity Act to a new decision by defendant.

## ORDER

IT IS ORDERED that:

1) Defendant's motion for summary judgment (dkt. #22) is GRANTED IN PART and DENIED IN PART. The motion is GRANTED with respect to plaintiff's claim under the Mental Health Parity and Addiction Equity Act and is DENIED in all other respects.

2) Plaintiff's motion for summary judgment (dkt. #26) is GRANTED IN PART and DENIED IN PART. The motion is GRANTED with respect to plaintiff's denial of benefits claim under ERISA and is DENIED in all other respects.

3) This case is REMANDED to Quartz Health Benefit Plans Corporation for further proceedings consistent with this opinion.

4) The clerk of court is directed to enter judgment for plaintiff and close this case.

Entered this 5th day of February, 2026.

BY THE COURT:
/s/
WILLIAM M. CONLEY
District Judge

23